UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION


NATHANIEL F. HARBERT,

          Plaintiff,

                Case No. 2:17-cv-01931-YY

   v.

                OPINION AND ORDER

DR. MARK PATTON; DR. NORTON; DR.
SHELTON; DR. DIGIULIO; DR. L.
GRUENWALD; DR. KELLY; DR. BEAMER; DR.
DEWSNUP; R. NUTT; D. LOZIER; MS. ORTIZ;
MS. PARKS; MS. HARDY; and MS. PRUITT,

          Defendant.


YOU, Magistrate Judge:

     *Pro se* plaintiff Nathaniel F. Harbert is a prisoner incarcerated at Two Rivers Correctional

Institution ("TRCI") in Umatilla, Oregon.  Plaintiff was diagnosed with a small left inguinal

hernia[1] in September 2016, and has filed numerous grievances, appeals, communication forms,

and requests relating to his medical care.  Defendants include plaintiff's treating doctor at TRCI,

Dr. Patton, and thirteen other individuals, including seven doctors (Dr. Norton, Dr. Shelton, Dr.

---

[1] "Inguinal hernias occur where the abdomen meets the thigh in the groin region and are
protrusions of soft tissue, such as subcutaneous fat or a portion of the intestine, through a weak
spot in the ileo-inguinal ligament or abdominal muscles."  Declaration of Mark Patton ("Patton
Decl.") ¶ 10, ECF #54 (emphasis omitted).

DiGiulio, Dr. L. Gruenwald, Dr. Kelly, Dr. Beamer, and Dr. Dewsnup), a pharmacist (R. Nutt), and five nurses (D. Lozier, Ms. Ortiz, Ms. Parks, Ms. Hardy, and Ms. Pruitt).

Plaintiff alleges three claims: (1) an Eighth Amendment deliberate indifference claim pursuant to 42 U.S.C. § 1983 against Dr. Patton for denying him hernia repair surgery (Amended Compl. 4, ECF #4); (2) a negligence or medical malpractice claim against Dr. Patton and members of the Therapeutic Level of Care ("TLC") Committee regarding treatment of his hernia (*id.* at 4-6); and (3) an Eighth Amendment deliberate indifference claim against Ortiz, Parks, Hardy, Pruitt, and Dr. Gruenwald for failing to provide appropriate treatment for his symptoms (*id.* at 6-7).

Defendants have moved for summary judgment. ECF #52. For the reasons discussed below, defendants' motion is granted.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "When judging the evidence at the summary judgment stage, the district court is not to make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party." *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the

"mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Id*. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

Pro se pleadings are "to be liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "This rule protects the rights of pro se litigants to self-representation and meaningful access to the courts, . . . [and] is particularly important in civil rights cases." *Pouncil v. Tilton*, 704 F.3d 568, 574-75 (9th Cir. 2012) (emphasis omitted) (citations and quotation marks omitted).

## DISCUSSION

### I.     Plaintiff's Medical Conditions

Plaintiff was admitted to the custody of the Oregon Department of Corrections ("ODOC") on October 6, 2009, is housed at TRCI, and is incarcerated until at least September 3, 2022. Declaration of Linda Simon ("Simon Decl.") ¶ 3, ECF #53. Along with the left inguinal hernia, plaintiff has been diagnosed with "chronic gastroesophageal reflux disease ("GERD"),[2] chronic low back pain, chronic irritable bowel syndrome ("IBS"),[3] and asthma." Declaration of Mark Patton ("Patton Decl.") ¶ 7, ECF #54. Plaintiff also has been evaluated for pain in his left hip and in his knees. *Id.* ¶¶ 33-35.

_____

[2] GERD is "a digestive disorder that affects the lower esophageal sphincter (ring of muscle between the esophagus and stomach) causing acid reflux. The symptoms can include burning chest pain or heartburn." Patton Decl. ¶ 36, ECF #54.

[3] IBS "is a common disorder that affects the large intestine. Symptoms include cramping, abdominal pain, bloating, gas, diarrhea, or constipation or both. This is a chronic condition with unknown origin that is not a serious condition and requires long term management of symptoms." Patton Decl. ¶ 37, ECF #54.

## II.    Exhaustion

Defendants argue that plaintiff failed to fully exhaust his administrative remedies because he did not appeal any of his grievances to the final level and he is therefore barred from pursuing his claims under the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a). Plaintiff claims that he fully appealed at least one of his grievances. This court agrees that one of plaintiff's grievances, TRCI-2017-06-144, is exhausted.

### A.    Legal Standard

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Congress enacted the PLRA "in the wake of a sharp rise in prisoner litigation in the federal courts." *Woodford v. Ngo*, 548 U.S. 81, 84 (2006). The PLRA strengthened the exhaustion requirement so that "[e]xhaustion is no longer left to the discretion of the district court, but is mandatory." *Id.* at 85 (citation omitted). "Prisoners must now exhaust all 'available' remedies . . . even where the relief sought—monetary damages—cannot be granted by the administrative process." *Id.* The exhaustion requirement "applies to all inmate suits about prison life" that do not involve the duration of a prisoner's sentence. *See Nettles v. Grounds*, 830 F.3d 922, 932 (2016) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)).

The PLRA's exhaustion requirement mandates proper exhaustion of administrative remedies. *Woodford*, 548 U.S. at 93. Proper exhaustion means that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Id.* at 88.

In *Williams v. Paramo*, 775 F.3d 1182 (9th Cir. 2015), the Ninth Circuit articulated the test for determining whether a prisoner exhausted administrative remedies, and if not, what justification excuses the failure to exhaust. First, a defendant must "prove that there was an available administrative remedy and that the prisoner did not exhaust that available remedy." *Id.* at 1191 (citation omitted). "Then, the burden shifts to the plaintiff, who must prove that there is something particular in his case that made the existing and generally available administrative remedies effectively unavailable to him by 'showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'" *Id.* (citation omitted). "The ultimate burden of proof, however, remains with the defendants." *Id.*; *Jones v. Bock*, 549 U.S. 199, 216 (2007).

Exhaustion of administrative remedies is an affirmative defense properly raised by a motion for summary judgment. *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014). "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." *Id.* "Exhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim." *Id.* at 1170.

**B.      ODOC Grievance Process**

Inmate grievances at TRCI are processed according to the ODOC Inmate and Grievance Review System, found in the Oregon Administrative Rules ("OAR"), Chapter 291, Division 109. Simon Decl. ¶ 6, ECF #53. Inmates are encouraged to communicate informally with line staff as the primary way to resolve disputes. OAR 291-109-0100(3)(a). If a dispute cannot be resolved informally, "it is the policy of [ODOC] to permit and encourage inmates to seek resolutions of

issues or disputes using the department's internal inmate grievance review and appeal system." OAR 291-109-0100(3)(b).

The processing of inmate grievances consists of three levels of review. To begin the process, an inmate must submit a signed grievance form to the functional unit grievance coordinator within 30 calendar days of the date of the incident giving rise to the grievance. OAR 291-109-0150(2), (4). Upon receiving the grievance form, the grievance coordinator must date stamp and log the form, and provide the inmate with a receipt. OAR 291-109-0150(3); OAR 291-109-160(1)(a). Unless further investigation is necessary, the grievance coordinator must process the grievance within 45 days, and send a response to the inmate. OAR 291-109-0160(2).

The inmate may appeal the denial of the initial grievance using a grievance appeal form, which must be submitted to the grievance coordinator together with the original grievance, attachments, and staff responses, within 14 days from the date the grievance response was sent to the inmate. OAR 291-109-0170(1)(a), (b). The scope of the original grievance cannot be expanded, and no additional information may be submitted, unless the information was unavailable when the original grievance was filed and the information is directly related to the issue being grieved. OAR 291-109-0170(1)(a)(A). The functional unit manager must respond to the appeal within 30 calendar days from the date the functional unit manager receives it. OAR 291-109-0170(1)(c).

Finally, the inmate can appeal the decision of the functional unit manager by submitting a grievance appeal form within 14 days from the date the first appeal response was sent to the inmate. OAR 291-109-170(2)(c). This second grievance appeal, which is decided by the Assistant Director, is not subject to further administrative review. OAR 291-109-0170(f).

### C.      Plaintiff's Grievances

On September 22, 2016, plaintiff complained of pain "radiating from his abdomen to his groin on his left side."  Patton Decl. ¶ 24, ECF #54.  Dr. Patton diagnosed plaintiff with a left inguinal hernia on September 27, 2016.  *Id.* ¶ 26.

On January 9, 2017, TRCI received an Inmate Discrimination Complaint from plaintiff and assigned it complaint number TRCI-2017-01-099.  Simon Decl. ¶ 31, ECF #53.  Plaintiff complained that he was being denied hernia surgery and requested an appointment with an "outside doctor."  ECF #53, at 43.  TRCI returned the complaint to plaintiff on January 24, 2017, indicating that he had failed to establish how he was discriminated against based on race, color, national origin, gender, religion, age, marital status, or disability.  *Id.* at 42.  Plaintiff did not appeal the decision.

On February 6, 2017, TRCI received a grievance from plaintiff and assigned it grievance number TRCI-2017-02-027.  *Id.* at 40.  This grievance also was related to the denial of hernia surgery.  *Id.*  TRCI sent plaintiff a response on March 9, 2017, explaining that Dr. Patton and the TLC committee[4] did not believe hernia surgery was necessary and his condition would be monitored.  *Id.* at 39.  Plaintiff did not appeal the decision.

On June 14, 2017, TRCI received a grievance from plaintiff and assigned it grievance number TRCI-2017-06-144.  ECF #60, at 12.  Plaintiff complained about an appointment he had with Dr. Patton on June 12, 2017, regarding problems with his bowel movements and requested a "second opinion on some medical issues that [he] was suffering from," as well as an apology from Dr. Patton.  *Id.*  Chart notes from plaintiff's June 12, 2017 appointment show he

---

[4] The TLC Committee consists of various providers who "review an inmate's care upon recommendation by the primary provider to determine the best plan of care."  Patton Decl. ¶ 4, ECF #54.

complained of abdominal pain and said his hernia "should be fixed." ECF #54-1, at 13. TRCI

received plaintiff's first-level appeal on July 14, 2017, and assigned it number TRCI-2017-06-

144A.[5] ECF #60, at 13. In his first-level appeal, plaintiff complained about Dr. Patton's

treatment of his stomach pain and hernia, and the denial of his request for a second opinion. *Id.*

TRCI responded to the appeal on August 22, 2017. *Id.* at 14. Plaintiff claims he submitted a

second-level grievance appeal form on September 1, 2017, and has offered a copy of it as

evidence. *Id.* at 16. The form does not have a revised grievance number and is not stamped

"Received" or "Accepted." *Id.* The "TO:" section also is not filled out. *Id.* At a hearing held

on July 10, 2019, plaintiff testified under oath that he submitted the form on September 1, 2017.

ECF #70. Additionally, the record contains an inmate communication form dated October 17,

2017, in which plaintiff asked about the second-level appeal form he claims he submitted. ECF

#60, at 15.

On September 13, 2017, TRCI received a grievance from plaintiff and assigned it

grievance number TRCI-2017-09-035. ECF #53, at 38. Plaintiff complained about Nurse

Ortiz's recommendation that he drink two-and-a-half gallons of water to help with his light-

headedness, shortness of breath, and disorientation. *Id.* TRCI responded to the grievance on

October 9, 2017. *Id.* at 36. On October 12, 2017, TRCI received plaintiff's first-level appeal

and assigned it number TRCI-2017-09-035A. *Id.* at 33. TRCI responded to the appeal on

November 22, 2017. *Id.* at 32. Plaintiff did not file a second appeal.

On December 28, 2017, TRCI received a grievance from plaintiff and assigned it number

TRCI-2017-12-149. *Id.* at 46. This grievance was related to pain that plaintiff complained of

---

[5] TRCI's response to the grievance form is not in the record.

following orbital socket surgery. *Id.* at 31. TRCI returned the grievance as it contained procedural defects. *Id.* 30. Plaintiff did not appeal the decision.

On February 21, 2018, TRCI received a grievance from plaintiff and assigned it number TRCI-2018-02-157.[6] *Id.* at 46. In this grievance, plaintiff claimed that Dr. Patton had made offensive comments to him. ECF #60, at 20. TRCI responded to the grievance on March 12, 2018. *Id.* at 21. On April 2, 2018, TRCI received a first-level appeal from plaintiff and assigned it number TRCI-2018-02-157A. *Id.* at 20. TRCI responded to the appeal on May 16, 2019. *Id.* at 19. Plaintiff did not appeal the decision.

### D. Analysis

#### 1. Availability of Administrative Remedy

To be available, a remedy must be available "as a practical matter; it must be capable of use; at hand." *Albino*, 747 F.3d at 1171 (quoting *Brown v. Valoff*, 422 F.3d 926, 937 (9th Cir. 2005)) (internal quotation marks omitted). "The obligation to exhaust 'available' remedies persists as long as *some* remedy remains 'available.'" *Brown*, 422 F.3d at 935 (emphasis in original).

In determining whether an administrative remedy was available, courts look to the applicable regulations explaining the scope of the administrative review process, testimonial evidence from prison officials who administer the process, and whether prisoners were apprised of the grievance system. *Albino*, 747 F.3d at 1175 (looking to whether prisoners were aware of the grievance system); *Brown*, 422 F.3d at 937.

To satisfy their initial burden of proving there was an available administrative remedy, defendants have submitted a declaration from Linda Simon, Acting Supervisory Executive

---

[6] The grievance form is not in the record.

Assistant to the Superintendent at TRCI in Umatilla, who supervises the grievance review system. Simon Decl., ECF #53. According to Simon, inmates are informed about ODOC's grievance review system at the Admission and Orientation ("A&O") class when they first arrive at the facility. *Id.* ¶¶ 1, 8. If an inmate misses the A&O class upon arrival, makeup classes are available. *Id.* ¶ 9. Inmates are also informed of the grievance process through an inmate handbook. *Id.* ¶ 10. Additionally, an inmate can ask any housing unit officer for a grievance form, which contains inmate grievance instructions. *Id.*

Plaintiff does not dispute that he was aware of the grievance system or that he knew how to obtain a form. Additionally, his regular usage of grievance forms shows his familiarity with the grievance process. *See* ECF #60 (showing plaintiff's complaint history, including 34 grievances).[7]

By submitting regulations explaining the scope of the administrative process and testimonial evidence of how inmates are apprised of the grievance system, defendants have established that there was an available administrative remedy. *See Brown*, 422 F.3d at 937; *Alexander v. Los Angeles Cty. Jail Sheriff*, No. CV 11–6981–SVW (E), 2014 WL 8392313, at *7-9 (C.D. Cal. Aug. 15, 2014) (finding that defendants carried their initial burden where declaration established that jail had an inmate complaint policy and complaint forms were openly available).

### 2. Exhaustion

Inmates must exhaust all available remedies before filing suit, including appealing an adverse decision to the highest level within the grievance system. *See Bennett v. King*, 293 F.3d

---

[7] Medical records also show that at one point plaintiff said to prison staff, "I'm going to grieve you. Believe me, I am good at it." ECF #54-1, at 29.

1096, 1098 (9th Cir. 2002); *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002). A mixed complaint, one containing both exhausted and unexhausted claims is not subject to dismissal on grounds that it contains unexhausted claims. *See Jones*, 549 U.S. at 219-224.

### a. Grievances TRCI-2017-12-149 & TRCI-2018-02-157

"In PLRA cases, amended pleadings may supersede earlier pleadings." *Jackson v. Fong*, 870 F.3d 928, 934 (9th. Cir. 2017). As a result, "[e]xhaustion requirements apply based on when a plaintiff files the operative complaint, in accordance with the Federal Rules of Civil Procedure." *Id.* at 935.

Plaintiff filed his initial complaint on December 1, 2017, and filed an amended complaint on December 27, 2017. Amended Compl., ECF #6. Thus, the December 27, 2017 amended complaint is the operative complaint. Plaintiff filed grievances TRCI-2017-12-149 and TRCI-2018-02-157 on December 28, 2017 and February 21, 2018, respectively. Because both grievances were filed after December 27, 2017, neither is exhausted.[8]

### b. Discrimination Complaint TRCI-2017-01-099 and Grievances TRCI-2017-02-027 & TRCI-2017-09-035

Plaintiff did not appeal the initial response to grievance TRCI-2017-02-027, or correct the procedural errors in discrimination complaint TRCI-2017-01-099.[9] Thus, plaintiff did not exhaust administrative remedies for either. OAR 291-109-0170(1)(a), (b); OAR 291-109-170(2)(c).

---

[8] Because grievance TRCI-2017-12-149, which relates to orbital socket surgery, is unrelated to the claims asserted in this action, it would be barred from consideration even if timely filed.

[9] The administrative rules for discrimination complaints are different than those for grievances. Namely, there is no multi-step appeals process. However, "[a] discrimination complaint that has been returned to the inmate by the discrimination complaint coordinator for procedural reasons cannot be reviewed. An inmate may elect to resubmit the discrimination complaint if the procedural errors can be corrected." OAR 291-006-0035(9).

As for TRCI-2017-09-035, plaintiff filed a first-level appeal but did not submit a second-level appeal. Thus, plaintiff did not exhaust administrative remedies for this grievance. OAR 291-109-170(2)(c).

### c.    Grievance TRCI-2017-06-144

Dr. Patton, who is the only defendant named in grievance TRCI-2017-06-144, argues that plaintiff never filed a second-level appeal of this grievance and therefore failed to exhaust administrative remedies. Reply, 2, ECF #64. However, at a hearing on July 10, 2019, plaintiff testified under oath that he filed a second-level appeal on September 1, 2017, but never received a response. He has submitted a copy of a second-level grievance appeal form dated September 1, 2017, as evidence. ECF #60, at 16. Additionally, the record contains an inmate communication form dated October 17, 2017, in which plaintiff inquired about the second-level appeal he had filed. *Id.* at 15.

The Ninth Circuit has held that factual disputes regarding exhaustion are entitled to an evidentiary hearing when it is not possible to conclusively decide credibility based on documentary testimony.[10] Here, no further evidentiary hearing is necessary because, other than making the argument, Dr. Patton has provided nothing to refute plaintiff's evidence that he filed a second-level appeal of this grievance.[11]

---

[10] *See, e.g.*, *Jones v. California Dep't of Corr.*, 584 F. App'x 496, 496 (9th Cir. 2014) (holding that it was inappropriate to grant summary judgment without first conducting an evidentiary hearing on exhaustion because the prisoner declared that he filed the necessary grievances to exhaust his claim); *Hubbard v. Houghland*, 471 F. App'x 625, 626 (9th Cir. 2012) (reversing court's decision to grant motion to dismiss, as the court improperly made a credibility determination on inmate's declaration regarding exhaustion without holding a hearing).

[11] Dr. Patton also argues that the subject of this grievance pertained to IBS and not the hernia. Reply 2, ECF #64. However, in this grievance, plaintiff complained about an appointment he had on June 12, 2017, and that he was not receiving a "second opinion on some medical issues [he] was suffering from." At June 12, 2017 appointment, plaintiff complained of abdominal pain

As noted, this grievance names only Dr. Patton.  Accordingly, to the extent plaintiff has alleged claims against any other defendants, those claims are unexhausted and summary judgment is granted as to those defendants.

## III.    Eighth Amendment Claim

In Claim I, plaintiff claims that Dr. Patton violated his Eighth Amendment rights by denying surgery for his inguinal hernia.  Amended Compl. 4, ECF #6.

### A.    Legal Standards

#### 1.    Eighth Amendment

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle*, 429 U.S. at 102 (quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)) (internal citations and quotation marks omitted).  "Thus, [courts] have held repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'"  *Id.* (citing *Trop v. Dulles*, 356 U.S. 86, 101 (1958)) (citing cases).

The government must "provide medical care for those whom it is punishing by incarceration," and failure to provide that care may constitute an Eight Amendment violation. *Estelle*, 429 U.S. at 103.  "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment."  *Id.* at 106.  "To establish an Eighth Amendment violation, a plaintiff must satisfy

---

and said his hernia "should be fixed."  ECF #54-1, at 13.  Additionally, in his first-level appeal, he specified both stomach pain and his hernia.  ECF #60, at 12.  Thus, the grievance sufficiently identified Dr. Patton's failure to treat his hernia as the subject of plaintiff's complaints.

both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds, Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

### 2. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (citation omitted). "In determining whether an officer is entitled to qualified immunity, [the court] employs a two-step test: first, [the court] decides whether the officer violated a plaintiff's constitutional right; if the answer to that inquiry is 'yes,' [the court] proceeds to determine whether the constitutional right was 'clearly established in light of the specific context of the case' at the time of the events in question." *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (citing *Robinson v. York,* 566 F.3d 817, 821 (9th Cir. 2009)).

### B. Analysis

The question of whether the denial of hernia surgery amounts to a constitutional violation has come up in a number of cases and is dependent on the circumstances of the case. The Ninth Circuit addressed the issue recently in *Hamby v. Hammond*, 821 F.3d 1085 (9th Cir. 2016). Hamby, an inmate, had an umbilical hernia that was "small" and "easily reducible." *Id.* at 1088. He was instructed how to push it back in if it popped out and given a rib belt. *Id.* He suffered from pain, but could walk without difficulty, and was prescribed medication, although he did not take it due to his other medical conditions. *Id.* Within a span of several months, Hamby was seen by prison medical staff at least ten times, during which time he complained of sharp pains

while sleeping, using the bathroom, and sitting for long periods.  *Id.*  His request for surgical

repair was denied, and he was told that his "condition [would] continue to be monitored as

needed by Health Services."  *Id.*  The following year, Hamby complained that the hernia

"interfered with [his] sleep," made "sitting down . . . difficult," and generated "random pain."

The hernia was still "easily reducible" and, although Hamby was in pain, he was going to meals

and his activities of daily living were not impaired.  *Id.* at 1088, 1089.  The Care Review

Committee, a group of medical professionals that decides whether treatments were medically

necessary, determined that surgery was not medically necessary and recommended continued

monitoring of the condition.  *Id.* at 1089.  Hamby was subsequently examined by a physician's

assistant who noted that he was attending classes and his "activities of daily living were

unaffected."  She described his hernia as "minimal," and recommended monitoring.  *Id.*  Hamby

later saw a urologist who also concluded that surgery was not medically necessary because

Hamby "did not have continual pain and was still performing his ADLs without incident."  *Id.*

The Ninth Circuit held that qualified immunity precluded Hamby's claim.  The court

recognized "many cases, both reported and unreported, holding that prison medical personnel did

not violate the Eighth Amendment even though they denied surgical treatment to an inmate with

a reducible hernia comparable to Hamby's."  *Id.* at 1094.[12]  "[A]n examination of existing case

---

[12] Citing *Johnson v. Doughty*, 433 F.3d 1001, 1003-04, 1013-14 (7th Cir. 2006) (holding prison medical personnel did not act with deliberate indifference when they opted for non-surgical treatment—a hernia belt, Tylenol, Metamucil, and monitoring—in response to prisoner's reducible inguinal hernia); *Brown v. Beard*, 445 F. App'x. 453, 455-56 (3rd Cir. 2011) (per curiam) (holding prison medical personnel did not violate Eighth Amendment when they refused to authorize surgery for prisoner's reducible hernia, instead prescribing pain medication and abdominal belt, plus monitoring, and despite another doctor's opinion that surgery was warranted); *Webb v. Hamidullah*, 281 F. App'x. 159, 166-67 (4th Cir. 2008) (per curiam) (similar); *Anderson v. Bales*, No. 12-2244, 2013 WL 1278122, at *1 (7th Cir. Mar. 29, 2013) (similar); *Rossi v. Nev. Dep't of Corrections*, 390 F. App'x. 719, 720 (9th Cir. 2010) (similar).

law demonstrates that the non-surgical treatment the defendants selected is not indisputably unconstitutional in circumstances like these." *Id.* "Eighth Amendment doctrine makes clear that '[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference.'" *Id.* at 1092 (citation omitted). "[E]xisting precedent does not 'place[ ] beyond debate the unconstitutionality of' the course of non-surgical treatment pursued by the prison officials in Hamby's case." *Id.* at 1094.

*Hamby* is instructive in analyzing plaintiff's claims, as discussed below.

### 1. Serious Medical Need

To satisfy the objective component of the Eighth Amendment analysis, a plaintiff must allege a deprivation that is "objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "A deprivation is sufficiently serious when the prison official's act or omission results in the denial of the minimal civilized measure of life's necessities." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) (quoting *Farmer*, 511 U.S. at 834) (internal quotation marks omitted).

A "serious medical need is present whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quotation and citation omitted). Examples of serious medical needs include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled in part on other grounds*, WMX *Technologies, Inc.*, 104 F.3d 1133 (9th Cir. 1997). "In deciding

whether there has been deliberate indifference to an inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (citation omitted).

In his Amended Complaint, plaintiff alleges that his left inguinal hernia causes him "severe pain," including while he is lying down, standing, and walking. Amended Compl. 4, ECF #6. Plaintiff claims he can no longer exercise, lift weights,[13] or play basketball, and has gained over forty pounds,[14] placing stress on his back and right knee. *Id.* Plaintiff also claims that he experiences stomach pain, bloody stools,[15] lack of appetite, and vomiting. *Id.*

Plaintiff's amended complaint is not verified, and plaintiff has not submitted a sworn declaration attesting to these facts in response to defendants' motion for summary judgment.[16] On summary judgment, "[o]nce the moving party meets its burden of establishing the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial." *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 323–24). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or

---

[13] Plaintiff claims that weightlifting is important to his psychological wellbeing: "Weight-lifting is a motivation in my life that keeps me going and happy." Amended Compl. 4, ECF #6.

[14] Medical records reveal that plaintiff's weight gain preceded the September 2016 left inguinal hernia diagnosis. When plaintiff was first admitted to ODOC on October 6, 2009, he weighed 230 pounds, and by April 10, 2013, he weighed 270 pounds. A year after being diagnosed, in August 2017, plaintiff weighed 281.2 pounds. Patton Decl. ¶ 43, ECF #54. Although the symptoms associated with his inguinal hernia may have contributed to the weight gain, it was not the only factor.

[15] "Lab tests were negative for blood." Patton Decl., ¶ 41, ECF #54.

[16] Plaintiff submitted a declaration, but it pertains to exhaustion of grievance number TRCI-2017-06-144. ECF #60, at 11.

denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

Nevertheless, medical records offered by the defense contain some evidence of plaintiff's complaints. For example, at an office visit on October 31, 2016, plaintiff complained of hernia pain. ECF #54-1, at 10. He stated that the pain was "worse" and "hurts all the way down" both legs. *Id.* He described that it hurt while running, lifting, and sitting. *Id.* At a November 23, 2016 visit, plaintiff complained of pain from his "hernia or something." Plaintiff complained of hernia pain again on December 12, 2016. *Id.* On May 17, 2016, plaintiff reported experiencing hernia pain since June of the previous year, and that it was worse and radiating up to under his ribs. *Id.* at 12. Chart notes from the same visit, however, indicate that plaintiff "denies pain in inguinal area," and instead other issues such as nausea, increased bowel movements, and stool color were discussed. *Id.* On June 12, 2017, plaintiff complained of abdominal pain again and said his hernia "should be fixed." *Id*. at 13. On July 14, 2017, plaintiff complained of a "dull pain" that "comes and goes" in the pelvis area/lower abdomen going into his right testicle. *Id.* at 14. Approximately two weeks later, on August 2, 2017, plaintiff again complained of lower abdominal and pelvic pain, and right pelvic pain "down inguinal hernia." On September 1, 2017, plaintiff complained of abdominal pain, diarrhea, bloody stools, and stools with the consistency of coffee grounds. *Id.* at 16. He also complained of inguinal hernia pain, and demanded, "I want my fucking surgery." *Id.* at 16-17. On September 11, 2017, plaintiff said he was feeling light-headed, having diarrhea, and not feeling well, and questioned whether his hernia was causing his symptoms. *Id*. at 18.

According to Dr. Patton, repair of plaintiff's inguinal hernia does not constitute a serious medical need. Patton Decl. ¶ 19, ECF #54. Plaintiff has been diagnosed with "a small limited

herniation into the left inguinal canal . . . that requires no medical or surgical intervention and has not changed over a period of two years." *Id.* ¶ 7. Hernias may develop complications known as incarceration or strangulation, which may require surgery. *Id.* ¶ 12. However, "[c]omplications are not inevitable and a hernia does not progress to complication over time." *Id.* In fact, "98% of patients who have diagnosed inguinal hernias do not experience the complicated condition of incarceration," and of the two percent who do, less than two percent of those individuals will have a strangulated hernia. *Id.* ¶¶ 15, 17. Plaintiff suffers from an uncomplicated hernia. *Id.* ¶ 13. This type of routine inguinal hernia does not constitute a serious medical need:

> Repair for a routine inguinal hernia is not a serious medical need, either inside or outside a correctional facility. Within a correctional facility, there is no realistic risk that a routine hernia will develop complications and remain untended. Outside a prison, un-repaired hernias are fairly common. The hernia often remains un-repaired because it does not cause substantial discomfort and the risk of incarceration is low. A medical reason for obtaining surgery to repair a hernia, other than to relieve minor discomfort or to accommodate a person whose work involves vigorous physical activity, is to eliminate the less than two percent (2%) risk that a hernia will incarcerate where medical attention is unavailable. While physicians in private practice will generally counsel surgery to repair a routine hernia, it is left to the patient to decide whether the risk/benefit and cost/benefit ratio warrants surgery. Patients often choose not to have surgery. Mr. Harbert does not have a complicated hernia and has access to medical staff twenty four hours a day, seven days a week.

*Id.* ¶ 19.

Moreover, according to Dr. Patton, "[t]here is no objective evidence that [plaintiff] was in pain due to his left inguinal hernia." *Id.* ¶ 38. Rather, "the symptoms he described that were causing him abdominal pain, i.e. pain in the abdomen at the umbilicas, increased bowel movements, constipation, pain radiating under ribs, loss of appetite, are more closely related to symptoms of IBS." *Id.* Additionally, plaintiff's complaints of low back pain are associated with degenerative disc disease, i.e. a normal, aging spine. *Id.* ¶¶ 31-32.

Thus, even when the evidence is viewed in the light most favorable to plaintiff, there is no serious medical need. Dr. Patton's uncontroverted medical opinion is that plaintiff's hernia does not require surgery, and there is no evidence that a "reasonable doctor" would find plaintiff's condition "worthy of the surgery." *McGuckin*, 974 F.2d at 1059-60. Moreover, plaintiff's pain is attributable to his other physical ailments. Patton Decl. ¶ 38. Even plaintiff himself has expressed some ambivalence that his hernia is the source of his pain and symptoms. *See* ECF #54-1, at 10 (on November 23, 2016, plaintiff complained of pain from his "hernia or something"); *id.* (on September 11, 2017, plaintiff complained of feeling light-headed, having diarrhea, and not feeling well, and questioned whether his hernia was causing his symptoms).

In any event, even if plaintiff has a serious medical need, Dr. Patton is entitled to summary judgment on the subjective prong of deliberate indifference, as discussed below.

### 2. Deliberate Indifference

For the subjective component, a plaintiff must show that the prison official was "deliberately indifferent" to a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. When a prison doctor manifests indifference "in their response to the prisoner's needs . . . [by] intentionally denying or delaying access to medical care," the subjective component is met. *Estelle*, 429 U.S. at 104-05. Deliberate indifference in this context means that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to

deliberate indifference." *Hamby*, 821 F.3d at 1092 (citing *Snow*, 681 F.3d at 987). "Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment was medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal quotation marks omitted)). The subjective test "focuses only on what a defendant's mental attitude was." *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 839) (internal quotation marks omitted).

"Before it can be said that a prisoner's civil rights have been abridged . . . the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. at 105-06). Additionally, because "a prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,'" officials who respond reasonably are not liable. *Farmer*, 511 U.S. at 844-45.

Here, as explained above, it cannot be said that Dr. Patton's "chosen course of treatment" for plaintiff's small, unchanged inguinal hernia was "medically unacceptable under the circumstances." *Toguchi*, 391 F.3d at 1058. It also cannot be said that Dr. Patton acted "in conscious disregard of an excessive risk to [plaintiff's] health." *Id.* Dr. Patton provided plaintiff with extensive and timely medical care. On September 27, 2016, five days after plaintiff complained of left inguinal pain, Dr. Patton performed an ultrasound. ECF #54-3, at 7. On December 13, 2016, plaintiff had an x-ray of his left hip after complaining that his hernia pain had worsened. *Id.* at 9. Dr. Patton performed another ultrasound on July 18, 2018, to compare it

with the results to the 2016 ultrasound, and determined that the hernia was unchanged.[17]  *Id.* at

13; Patton Decl. ¶ 29, ECF #54.

Dr. Patton also submitted two requests to the TLC Committee for possible hernia surgery,

one in December 2016 and another in February 2017.  Patton Decl. ¶¶ 27, 28, ECF #54; ECF 54-

5, at 27-28.  In the 2016 request, Dr. Patton noted it would be helpful if plaintiff lost weight, and

after plaintiff lost weight, Dr. Patton submitted a second request to the TLC Committee in 2017.

*Id.*

Along with the care described above, Dr. Patton has prescribed medications to help

plaintiff deal with the various symptoms he experiences.[18]  Of note, plaintiff has refused to take

certain prescribed medications because he doesn't "want to have to go to [the] medication line."

ECF #60, at 14.

Even viewing the evidence is viewed in the light most favorable to plaintiff, there is no

indication that Dr. Patton had the culpable state of mind to meet the "high" standard for

deliberate indifference.  *Toguchi*, 391 F.3d at 1060.  Plaintiff has offered no evidence that Dr.

Patton's treatment was medically unacceptable under the circumstances or that it was chosen in

conscious disregard of an excessive risk to plaintiff's health.  *Id.* at 1058.  A "difference of

opinion between a physician and the prisoner" is not enough to constitute deliberate indifference.

---

[17] Since being incarcerated in 2009, plaintiff has received a total of 11 x-rays and three
ultrasounds for back, abdomen, knee, chest, hand, hip, and head pain or injuries.  ECF #54-2, at
75-76; ECF #54-3, at 1-13.

[18] "At present [plaintiff] is prescribed Mirtazapine for treatment of depression, Simvastatin for
high cholesterol, Ranitidine for symptoms of GERD and IBS, and Sebex medicated shampoos.
[Plaintiff] can obtain ibuprofen and Tylenol on his housing unit at no cost for pain management
of his chronic low back pain."  Patton Decl. ¶ 8, ECF #54.

*Hamby*, 821 F.3d at 1092 (citation omitted). In this case, there is simply no evidence of indifference, let alone indifference that is "substantial." *Broughton*, 622 F.2d at 460.

### 3. Qualified Immunity

Moreover, as in *Hamby*, "an examination of existing case law demonstrates that the non-surgical treatment the defendants selected is not indisputably unconstitutional in circumstances like these." 821 F.3d at 1094. "[E]xisting precedent does not 'place[] beyond debate the unconstitutionality of' the course of non-surgical treatment pursued by the prison officials in [plaintiff's] case." *Id.* (citation omitted). Accordingly, even assuming for the sake of argument that there is a constitutional violation, Dr. Patton would be entitled to qualified immunity.

## IV. Negligence/Medical Malpractice

In his second claim, plaintiff alleges a claim of negligence, or medical malpractice, against Dr. Patton.[19] Amended Compl. 4-6, ECF #6.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend XI. Under the Eleventh Amendment, federal courts may not entertain lawsuits brought by citizens against a state without the state's express consent. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996). "The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985). The court "will find waiver only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for

---

[19] Plaintiff also asserts this negligence claim against other defendants, but as discussed above, any claims against defendants other than Dr. Patton are unexhausted.

any other reasonable construction"). *Edelman v. Jordan*, 415 U.S. 651, 673 (1974). The OTCA contains no such express consent to file suit against the state in federal court. *Estate of Pond v. Oregon*, 322 F. Supp. 2d 1161, 1165 (D. Or. 2004).

It is apparent from the evidence presented in this case that Dr. Patton was acting in his official capacity. "When a plaintiff brings a lawsuit against a government officer in his official capacity, a court treats the suit 'as a suit against the entity' that employs the officer." *Updike v. Clackamas Cty.*, No. 3:15-CV-00723-SI, 2015 WL 7722410, at *3 (D. Or. Nov. 30, 2015) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Dr. Patton is an employee of ODOC, which is an arm of the State of Oregon. *See Osborne v. Hill*, No. CV 05-641-HA, 2006 WL 1215084, at *1 (D. Or. May 1, 2006) (finding ODOC is an arm of the State of Oregon). Thus, the state law negligence/medical malpractice claim suit must be treated as one against the State of Oregon and dismissed under the Eleventh Amendment.

## ORDER

Defendants' Motion for Summary Judgment (ECF #52) is GRANTED and this case is dismissed with prejudice.

DATED  August 30, 2019.

_____
/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge